IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>THOMAS JAMES ZAJAC,<br><br>　　　　　　Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No.  2:06CR811DAK |

　　　　　This matter is before the court on Defendant Thomas Zajac's Second Amended Motion to Dismiss and Defendant's Motion to Dismiss for Violations of the Defendant's Rights to Counsel and Due Process.  The parties have fully briefed the motions.  The court held a hearing on the due process motion on March 19, 2008, and a hearing on the second amended motion to dismiss on April 16, 2008.  At the hearings, Defendant was present and represented by Deirdra A. Gorman and Edwin S. Wall.  The government was represented by Carlos A. Esqueda and Eric G. Benson.  Now being fully advised, the court enters the following Memorandum Decision and Order.

**<u>Defendant's Second Amended Motion to Dismiss</u>**

　　　　　The Indictment in this case alleges that on September 15, 2006, Defendant detonated a pipe bomb at the Salt Lake City Public Library.  Defendant seeks to dismiss Counts I and II against him under the federal arson statute on the basis that the explosion of the pipe bomb at the Salt Lake City Library did not cause damage to real or personal property used in any activity affecting interstate commerce.

The federal arson statute, 18 U.S.C. § 844(i), creates criminal liability for anyone who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Accordingly, this statute reaches arson that damages a building used in any activity affecting interstate commerce.

While the commerce clause of the United States Constitution has provided Congress with far reaching power, Defendant argues that the power to regulate commerce is not unlimited. The commerce clause power cannot be read so broadly as to "effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). Under Section 844(i) of the arson statute, the "damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce. The proper inquiry . . . is into the function of the building itself, and then a determination of whether that function affects interstate commerce." *United States v. Jones*, 529 U.S. 848, 854 (2000).

In *Jones*, the defendant had thrown a Molotov cocktail through the window of a private home. *Id.* at 851. The defendant was charged under Section 844(i) of the arson statute, but the Supreme Court vacated the conviction. *Id.* at 852. The court reasoned that the home's only active employment was as a dwelling place used for every day family living and it was not a building "used" in interstate commerce. *Id.* at 859. In *Jones*, the Court explained that Section 844(i) applies only to "property currently used in commerce or in an activity affecting commerce" and that the term "used" indicated Congress' intent to limit the statute's reach to buildings whose "active employment" relates to interstate commerce. *Id.* at 855, 859.

Unlike a private residence, the government argues that the Salt Lake City Library fits within the definition of Section 844(i) because it is currently used in commerce and in an activity affecting commerce. The *Jones* Court distinguished the facts before it from a previous case, *United States v. Russell*, which involved the arson of an apartment building. In *Russell*, the residence was an apartment building which was being rented to tenants when the defendant attempted to set fire to the building. The *Jones* Court said that Congress "intended to exercise its full power to protect 'business property.'" *Id.* at 859-60. When considering what constitutes "use" of interstate commerce, the Court held that "[t]he rental of real estate . . . is unquestionably" such an activity. In addition, in *Russell*, the Court noted that "the legislative history suggests that in § 844(i) Congress at least intended to protect all business property, as well as some additional property that might not fit that description." 471 U.S. at 862.

In addition to housing books, magazines, pictures, audio and video recordings, and other media, the Salt Lake Library houses several businesses and organizations as tenants. As of November 2007, the Library rents to commercial ventures such as The Library Store, The Salt Lake Roasting Company, The English Garden, Joy's Deli, and Night Flight Comics. The Library also houses nonprofit and educational organizations such as the Salt Lake Community College Writing Center, Art at the Main, and the SLC Film Center. In addition, the Library is also home to a national public radio station, KCPW. The library also rents out conference rooms and other spaces for banquets and weddings.

In *United States v. Gillespie*, 452 F.3d 1183, 1188 (10th Cir. 2006), the court found that a Jewish synagogue that also housed a preschool and a gift shop was "a building used in or affecting an activity in interstate commerce within the meaning of 18 U.S.C. § 844(i)." Like the

3

synagogue, the library is also commercial in nature in that it leases space to shops, hosts conferences, banquets, lecture series, and film screenings, and also rents out space for such events. The businesses at the library–such as the gift shop, florist, café, deli, comic book shop–show that the library "was being actively employed for commercial purposes." *Gillespie*, 452 F.3d at 1188. Defendant attempts to make a distinction between the area of the library that houses its circulating materials and the retail area because it is separated by a large hallway. The court finds no basis for making such a distinction. The entire building is the library. Moreover, there is no clear distinction to be made because even following Defendant's logic, there is not a clear commercial-noncommercial split between the two areas. The library's auditorium is on the side Defendant claims is commercial. And the area housing the books contains a coffee shop. Furthermore, the library itself sells book bags and has copying facilities.

In *United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001), the defendant was charged under Section 844(I) for an arson attack on a building used by the Church of Jesus Christ of Latter-day Saints in New Mexico. The court rejected the defendant's challenge that the church building was not a "use" of interstate commerce in light of *Jones*. *Id.* at 1204. The court reasoned that the building was used for a broad range of functions, was open to the public and travelers, provided a constant flow of information, money, and purchase of goods back and forth across state lines. The court specifically noted that "[l]ibrary materials, a wide variety of office and teaching equipment . . . were obviously purchased in interstate commerce." *Id.*

Like the church in *Grassie*, the library functions as a repository and lender of books and other media that are purchased in interstate commerce. A substantial portion of the library's collection has moved in interstate commerce. The goods and services are available to the

4

general public, including travelers from outside of the state.  The Library also holds conferences and guests lecturers from outside the state.  Considering the business housed at the library as well, the library has far more interstate connections and activity than a local church.

Although Defendant argues that the library is for Salt Lake City residents, the library sells library cards to people from outside of Salt Lake County for a fee.  In *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964), the Supreme Court noted that even where a business's operations may appear "local," Congress may properly regulate it under the Commerce Clause where the business services travelers.  *Id.* at 258.  The Salt Lake Library not only sells library cards to residents of other states, it also attracts out-of-state presenters and participants to conferences and lectures held at the library.

Therefore, the court concludes that the Salt Lake Library is a building used in interstate commerce or in activities affecting interstate commerce under Section 844(1).  Accordingly, the court finds no basis for dismissal of Counts I or II based on interstate commerce grounds.  Defendant's Second Amended Motion to Dismiss is denied.

### **Motion to Dismiss for Violations of Defendant's Right to Counsel and Due Process**

Defendant argues that the government improperly intruded on the attorney-client relationship and violated his rights under the Fifth, Sixth, and Fourteenth Amendments by reviewing recorded conversations between Defendant and his counsel.  Defendant has been housed in the Weber County Jail in Ogden, Utah pending his trial.  According to jail policy, a prisoner must make long-distance telephone calls collect.  The jail does not allow an attorney to call his or her client directly.  Therefore, if a prisoner wishes to call his or her attorney, he or she must make a collect call.  Jail policy also requires that collect calls made from the jail be

recorded. This policy applies to legal calls, with the exception of telephone calls made to the Federal Public Defender's office in Salt Lake City. At the beginning of each collect telephone call, a pre-recorded statement tells the caller that the call may be monitored or recorded.

Defendant has had several defense attorneys on his case, and he has had several telephone calls with these attorneys, who are located in Salt Lake City. Defendant states that the recorded telephone calls in this case include conversations directly pertaining to Defendant's defense–his representation and concerns in the case and information concerning the development of the defense of the case.

Defendant claims that the United States Attorney's Office has obtained digitally recorded legal calls between Defendant and his previous counsel as well as law enforcement reports summarizing those calls. Contrary to Defendant's allegations, the government represents that it did not record, review, or request any attorney-client materials. At the outset of the case, the government used its subpoena power to legally investigate telephone calls placed by Defendant from the jail. The government states that it had reason to believe that Defendant had made incriminating statements to the press and family members and justly sought that information.

As a matter of business practice, the Weber County Jail does not and cannot separate telephone calls. Because the lists provided by the jail contained only a list of telephone numbers, the government took efforts not to review any recorded conversation which remotely addressed attorney-client communications. Specifically, the ATF agents and U.S. Attorney's Office identified those calls made to telephone numbers of Defendant's counsel and purposefully did not review or listen to the telephone calls made to attorneys because they could have contained attorney-client communications.

6

However, to fully comply with discovery rules, the government provided the incriminating calls as well as the other calls made by the defendant. The government provided to Defendant's counsel the entire record in discovery because the jail had provided the entire record to it. While the government took care not to review any privileged material, it did not exclude those potentially privileged conversations from defense counsel when it provided discovery.

The discovery included material which referenced telephone call records, i.e., people who the defendant called. But the report did not provide any summary of the conversations. In fact, the government states that both it and ATF Special Agent Michael Minichino made every effort not to review any telephone recordings which appeared to have any type of attorney-client conversations even though Defendant's representation changed repeatedly during the pretrial process.

The Tenth Circuit has held, "[A] prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment." *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1996). Thus, the court held that "when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed." *Id.*

7

In *Shillinger*, the defendant and attorney were required to prepare for trial in jail with a deputy present at all times. *Shillinger*, 70 F.3d at 1134. During trial, it became apparent that the deputy related information to the prosecutor that had passed between defense counsel and the defendant during trial preparations. The Tenth Circuit affirmed the grant of habeas relief and remanded the case to the district court for consideration of the appropriate remedy. *Id.* at 1143.

Defendant asserts that there is a presumption of prejudice in this case. Defendant argues that, as in *Shillinger*, there was no alternative to the calls and the information from the calls has been passed to the prosecutor. This argument, however, fails to recognize that defense counsel in this district routinely visit their clients in jail and have face-to-face meetings with respect to privileged matters.

In Schillinger, the court stated that it was faced with "a case in which the prosecutor, by his own admission, proceeded for the purpose of determining the substance of [defendant's] conversations with his attorney, and the attorney-client communications were actually disclosed." *Id.* at 1141. This is not such a case. The prosecutors in this case had a legitimate investigatory reason for subpoenaing Defendant's telephone records from the jail. When the jail was unable to separate which calls were to attorneys, the government then employed means for identifying which telephone numbers belonged to Defendant's counsel and protecting any of the telephone calls that were made to those attorneys. Defendant asserts that the government summarized the telephone calls, but the alleged summaries merely list the telephone calls placed by Defendant to others. The document states the name and telephone number of the defendant's outgoing calls, but gives no information about the substance of the conversation, nor any information as to whether the telephone call was reviewed.

Defendant fails to provide any specific communication, transcript, or documentation which demonstrates that the government obtained any evidence or content from these conversations or listened to the conversations. Defendant provides conclusory and speculative accusations that the government engaged in egregious and outrageous illegal conduct. There are no specific facts to support Defendant's allegations that there was an intrusion of the attorney-client privilege or that such intrusion was purposeful. The "benchmark" of the Sixth Amendment is "the fairness of the adversary proceeding." *See Nix v. Whiteside*, 475 U.S. 157, 175 (1986). Given the factual circumstances of this case, the court concludes that there is no basis for presuming prejudice in the present case. Because Defendant has failed to show a deprivation of his rights and there is no evidence of wrong-doing, the court finds that there is no basis for dismissing the Indictment.

## CONCLUSION

Based on the above reasoning, Defendant's Second Amended Motion to Dismiss is DENIED and Defendant's Motion to Dismiss for Violations of the Defendant's Rights to Counsel and Due Process is DENIED.

DATED this 21st day of April, 2008.

BY THE COURT:

*/s/ Dale A. Kimball*
Dale A. Kimball
United States District Judge