IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>THOMAS JAMES ZAJAC,<br><br>        Defendant. | **MEMORANDUM DECISION<br>AND ORDER<br>RE: 404(b) EVIDENCE**<br><br>Case No. 2:06-cr-00811 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

This matter is before the court on Defendant Thomas James Zajac's motion to exclude 404(b) evidence. Defendant is charged with bombing the Salt Lake City Public Library. The government proposes to introduce evidence of two prior bombings, for which Zajac has not confessed, to establish Zajac's identity, knowledge, and special skill.[1] It also proposes to introduce evidence of three prior bad acts committed by Zajac for purposes of proving his "intent, motive, state of mind and *modus operandi*."[2] The court concludes, assuming all other evidentiary requirements are met, that the government may introduce evidence pertaining to the Hinsdale bombing, but limits the scope of what may be introduced. The court excludes all other evidence of prior bad acts.

## FACTUAL BACKGROUND

### Salt Lake City Bombing

On September 15, 2006, an explosion occurred at the Salt Lake City Public Library.

---

[1] United States' Memo. in Opp. to Def's Mot. in Limine to Exclude Rule 404(b) Evidence, 19 (Docket No. 343) (hereinafter "Gov't 404(b) Opp. Memo.").

[2] *Id.* at 31–32.

Investigators found remnants of what appears to have been a pipe bomb. The explosive filler was Alliant Blue Dot smokeless powder contained in a black steel pipe with galvanized iron end caps. The device had a time delay made from a kitchen timer. It used a model rocket igniter connected to a nine-volt alkaline battery. A sealant was used both on the wire lead from the timer and on the base of the battery. The wiring was 22 American Wire Gauge black insulated copper wiring. The device was mounted to a flat, cardboard surface with silicone.[3]

On or about October 25, 2006, the Salt Lake City Police Department received a letter. The letter indicated the Salt Lake City bombing was a result of the police "strong-arm[ing] a helpless person."[4] The author stated the bomb was a mere warning shot, but if the news reported the police were using "their position to bully a person," the next bomb would "be designed to kill."[5] The letter had a postmark of October 23, 2006, from Omaha, Nebraska. The government intends to put on evidence showing that Zajac was in Omaha during the weekend of October 20–22, 2006. Additionally, the government intends to show that the Salt Lake City Police Department had an encounter with Zajac's son that resulted in his son being charged with a D.U.I. The government contends that encounter was the triggering event for the Salt Lake City bombing and what was alluded to when the letter discussed strong-arming a helpless person.

---

[3] *See* Gov't 404(b) Opp. Memo. at 10 and Exhibit 1 attached thereto for details of the device's characteristics. For purposes of this motion, the court has assumed the background facts will be supported by evidence to be offered. The court has made no decision as to whether such evidence will meet other evidentiary requirements to be admissible. This same qualification applies to all facts assumed for purposes of this memorandum decision and order.

[4] *Id.* at Exhibit 2 (Salt Lake City Letter).

[5] *Id.*

**Downers Grove Bomb**

On August 9, 2004, a pipe bomb was found on Main Street in Downers Grove, Illinois. The device had failed to explode due to a wiring error.[6] The bomb's explosive filler was Alliant Blue Dot smokeless powder contained in a galvanized steel pipe with galvanized iron end caps. The device had a time delay made from a heat light timer. It used a model rocket igniter connected to four AA batteries. The wiring was 22 American Wire Gauge black insulated copper wiring. Based on the information submitted to the court, the bomb was not attached to cardboard, nor was silicone used. Instead, a polyurethane adhesive and tape were used.[7]

About one year after the bomb was discovered, the Downers Grove Police Department received a letter informing it that three bombs would explode the following day and kill twenty people. The letter referenced the bomb that had been found the prior summer and said the reason more bombs were planned was because the department had "attacked innocent people, and now innocent people will pay, on your behalf."[8] Prior to discovery of the bomb, Zajac had been arrested by the Downers Grove police for disorderly conduct related to harassing communications.[9] At this time, Zajac has not been charged for the Downers Grove bombing.

**Hinsdale Bombing**

On September 1, 2006, a bomb exploded in a trash container at the Hinsdale Metra train station. Investigators determined it was a pipe bomb. The explosive filler was Alliant Blue Dot

---

[6] Although the bomb misfired, for ease of reference, the court will refer to it as a bombing.

[7] *See* Gov't 404(b) Opp. Memo. at 4 and Exhibit 1 attached thereto for details of the Downers Grove bomb characteristics.

[8] *Id.* at Exhibit 2 (Downers Grove Letter).

[9] Gov't 404(b) Opp. Memo. at 3.

smokeless powder contained in a PVC square head plug with a PVC end cap. The device had a time delay made from a kitchen timer. It used a model rocket engine connected to a nine-volt alkaline battery. A silicone sealant was used on the base of the battery. The wiring was 22 American Wire Gauge black insulated copper wiring. The device was mounted to a flat, cardboard surface with silicone.[10]

On or about October 12, 2006, the Hinsdale Police Department received a letter. The letter indicated the Hinsdale bombing was a result of the police using "their positions as officers to intimidate and harass a non-threatening person in need of their help. As far as they knew, the person's life was in danger. Instead of helping they did what they could to cause as much pain as was possible."[11] The author stated the bomb was a warning shot, but the next bomb would lead to the death of a least one citizen.[12] The government asserts that fingerprints were found on the letter and envelope that match Zajac's.[13]

Prior to the bombing, a Hinsdale police officer saw Zajac's son checking his pulse while standing next to his vehicle. The officer asked Zajac's son if he was okay, to which he said he was fine. The officer then ran the vehicle registration and learned Zajac's son had an outstanding traffic warrant. Consequently, the officer arrested him. When Zajac and his wife arrived at the police station to post a bond, Zajac became agitated, swore at an officer, kicked in a chair and punched a

---

[10]   *See* Gov't 404(b) Opp. Memo. at 7 and Exhibit 1 attached thereto for details of the device's characteristics.

[11]   *Id.* at Exhibit 2 (Hinsdale Letter).

[12]   *Id.*

[13]   No evidence was offered by the government to support this assertion. The analysis in this ruling assumes, without deciding, the proffered evidence will survive any challenge the defendant may make.

glass door. Zajac then hit his wife in the face when she attempted to calm him, which resulted in his arrest and conviction for domestic battery. The government contends this chain of events was the trigger for the Hinsdale bombing. Recently, Zajac was indicted for the Hinsdale bombing and that case is proceeding in Illinois.

**Analysis of the Letters**

The government seeks to introduce expert testimony from James Fitzgerald ("Fitzgerald") about his analysis of the three letters.[14] According to Fitzgerald, all three letters were authored by the same person based on similarities he perceives between the letters. Although Fitzgerald discusses several areas of analysis, he particularly focuses on three similarities. First, each letter has sentences that begins with "And." While it is grammatically correct to begin a sentence with "And," Fitzgerald opines that it is "somewhat idiosyncratic."[15] Second, the Downers Grove letter and the Salt Lake City letter both "use an asterisk to indicate a footnote."[16] Fitzgerald stated this was "very rare" among letters assessed at the Behavioral Analysis Unit-1 of the Federal Bureau of Investigation.[17] A database of 2,238 threat letters contained only two documents that also used an asterisk to denote a footnote.[18] Those two documents were written "by the same self-identified author" in 1999.[19]

---

[14] Zajac has filed a motion to exclude James Fitzgerald's testimony, which motion is addressed in a separate decision.

[15] Forensic Linguistic/Authorial Attribution Report, at 6 (Aug. 29, 2007) (Def's Hr. Ex. 1).

[16] *Id.* at 8.

[17] *Id.*

[18] *Id.* at 9.

[19] *Id.*

Third, Fitzgerald noted thematic and topical similarities between the letters.  Fitzgerald pointed to the following phrases to show similarity between the Downers Grove letter and the Salt Lake City letter:[20]

| **Downers Grove letter** | **Salt Lake City letter** |
| --- | --- |
| Perform your job with respect and dignity for the people you serve and you will save their lives. | . . . about how your men are to conduct themselves in the future. This will save lives of Salt Lake City citizens. |

In contrast, Fitzgerald noted the following similarities between the Hinsdale letter and the Salt Lake City letter:[21]

| **Hinsdale letter** | **Salt Lake City letter** |
| --- | --- |
| Not too long ago you f***** with the wrong person. | When you f***** with mine you picked the wrong person. |
| . . . I fired a warning shot last month. | I fired a shot over your bow, as a . . . stern warning. |
| A couple of your goons used their positions as officers to intimidate and harass a non-threatening person in need of their help. | To gain recognition within your department and community you strong-armed a helpless person. |
| I'll be watching and listening to news of the police department . . . if I hear of foul play by your men someone is dead. | I will occasionally be reading Channel 5 News . . . <br><br>and<br><br>. . . if I hear one peep in the media about foul play from your department. |

---

[20] *Id.* at 7.  Fitzgerald also stated there was one similarity between the Downers Grove letter and the Hinsdale letter—the first said "Now for the big one" and the other said "Now it's my turn." *Id.* at  6.

[21] *Id.* at 6–7.

| You have been embarrassed and humiliated by the first experience. The next one will repeat that, many times over. | You have been humiliated and insulted at not preventing the attack, and by not solving it. Your punishment will be the same situation again times 10. |
| But the ongoing costs will be significant as well. You'll be forced to install cameras in public places. | And you will be forced to upgrade security in the city, where my victory is in your spending untold amounts on such systems. |
| Better sit & talk with your men. | You need to teach your men the difference. |

**Telephone Threat Matter**

On September 11, 1999, officers observed two teenage boys, dressed in camouflage, exit a wooded area with paintball guns, two-way radios, and binoculars or a monocular. One of the boys was Zajac's son. The officers called his mother, who came to the scene, and they gave the boys a warning. A few days later, one of the officers started receiving telephone calls and recognized Zajac's voice. Zajac left voice-mail messages informing the officer that now he would have to deal with him. Zajac also made racial slurs against him. Due to the content and tone of the messages, the officer referred the matter to his supervisor. When his supervisor called Zajac, Zajac swore at him and said he would kill him if he ever saw him.[22]

**Harassment and Disorderly Conduct Matter**

Also in 1999, an employee filed sexual harassment and retaliation charges against Zajac. Between 2000 and 2003, the employee reported "that her home was vandalized, a brick was thrown through a window, windows were shot out by a pellet gun, her vehicle windshield was smashed, her vehicle tires slashed, a doll was hanged from her tree outside her home and harassing letters [were]

---

[22] *See* Gov't 404(b) Opp. Memo. at 14 (Docket No. 343).

left in her mailbox."[23]

On or about May 17, 2003, the former employee contacted the Downers Grove police about a harassing letter found in the mail. Fingerprints matching Zajac's were found on the letter. On July 30, 2003, the former employee reported that she observed Zajac placing another letter in her mailbox. Officers responded to the area and found Zajac driving in the vicinity. The officers stopped Zajac and placed him under arrest. An additional letter to the former employee was found on Zajac at the time of arrest. He was charged with disorderly conduct.[24]

**Property Damage Matter**

The final incident the government contends should be admitted into evidence pertains to Zajac's criminal conviction for destruction of public property. Zajac was fined for failing to pay toll fees for use of a tolled highway. After receiving notice of the fine, on September 26, 2004, Zajac poured ProBond Liquid glue into a toll collection device, causing several thousand dollars of damage. The event was recorded on video, and Zajac was convicted for a Class 4 felony on October 27, 2005.[25]

## ANALYSIS

### I. BURDEN OF PROOF

"Where evidence is offered under Rule 404(b), the government bears the burden of showing that the proffered evidence is relevant to an issue other than character."[26] Additionally, the

---

[23] *Id.* at 15.

[24] *Id.* at 15–16.

[25] *Id.* at 13.

[26] *United State v. Youts*, 229 F.3d 1312, 1317 (10th Cir. 2000) (citation omitted).

government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from" the evidence of prior acts.[27]  If the court determines evidence of prior acts may be admitted, it must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom."[28]

When a question exists whether a defendant committed a prior act, such evidence may be admitted, nevertheless, "if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act."[29]  Evidence is sufficient if it shows "by a preponderance of the evidence" that the defendant committed the prior act.[30]

## II.    EVIDENCE OF PRIOR ACTS

### A.    Standard for Admission

Rule 404(b) of the Federal Rules of Evidence states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .[31]

The Tenth Circuit has stated that Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition."[32]  To determine the

---

[27]  *Id.* (quotation marks and citation omitted).

[28]  *Id.* (citation omitted).

[29]  *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

[30]  *Id.* at 690 (citation omitted).

[31]  Fed. R. Evid. 404(b).

[32]  *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (quotation marks and citation omitted).

admissibility of evidence under Rule 404(b), the Tenth Circuit applies the following four-part test:

> (1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests.[33]

### B.    Prior Bombings

#### 1.    Proper Purpose

"Evidence is admitted for a proper purpose if allowed for one or more of the enumerated purposes in Rule 404(b)."[34] "The list of proper purposes is illustrative," however, and "not exhaustive."[35] The government proposes to introduce the prior bomb evidence to establish Zajac's identity, knowledge, and special skill.[36] Rule 404(b) expressly recognizes that admitting evidence to show identity and knowledge is for a proper purpose. Moreover, when establishing identity, special skill can be a relevant factor under a Rule 404(b) analysis.[37] Thus, the court concludes that admitting the prior bomb evidence to show identify, knowledge, and special skill is for a proper purpose.

#### 2.    Relevancy

Next, the government must establish that the proposed evidence is relevant. Evidence "is relevant if it tends to prove or disprove one of the elements necessary to the charged offense."[38]

---

[33] *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (citations omitted).

[34] *Id.*

[35] *Tan*, 254 F.3d at 1208.

[36] Gov't 404(b) Opp. Memo., at 19 (Docket No. 343).

[37] *See United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997) (listing "skill" as a factor in determining the "signature quality" of a crime) (citation omitted).

[38] *Mares*, 441 F.3d at 1156–57 (citing Fed. R. Evid. 401).

When attempting to admit evidence of prior conduct, the conduct "must share similarity with the charged crime."[39] "Similarity" should be based on the totality of the comparative evidence, "demanding not a facsimile or exact replica but rather the conjunction of several identifying characteristics or the presence of some highly distinctive quality."[40] Nonetheless, "[t]he more similar the act or state of mind is to the charged crime, the more relevant it becomes."[41]

Zajac denies being involved in the Salt Lake City bombing. As stated above, the government proposes to use other bomb evidence to prove his identity. When using other acts to establish identity, "the acts [must] share enough elements to constitute a signature quality.'"[42] "Elements relevant to a 'signature quality' determination include," but are not limited to, "the following: geographic location, the unusual quality of the crime, the skill necessary to commit the act, or use of a distinctive device."[43] Moreover,

> the weight to be given to any one element and the number of elements necessary to constitute a "signature" are highly dependent on the elements' uniqueness in the context of a particular case. In other words, a few highly unique factors may constitute a "signature," while a number of less unique factors although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together.[44]

Besides showing a "signature quality," an additional hurdle exists because Zajac has not been

---

[39] *Mares*, 441 F.3d at 1157.

[40] *See United States v. Trenkler*, 61 F.3d 45, 54 (1st Cir. 1995) (quotation marks and citations omitted).

[41] *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000) (citation omitted).

[42] *See United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997) (citations omitted).

[43] *Id.* (internal citations and parentheticals omitted).

[44] *Id.* (quotation marks and citation omitted).

convicted for the prior bombings. Thus, there must also be "sufficient evidence to support a finding by the jury that [Zajac] committed the [prior] similar act."[45]

The Salt Lake City incident does not have a close geographical location to any of the other bombings. The government asserts, however, that the evidence will show that Zajac was at the geographical location of each bombing at the time of the bombing. Thus, while the prior bombings were not geographically close to Salt Lake City, Zajac's presence at those geographical locations is probative of identity.

As to the unusual quality of the crime, the First Circuit has found that "[a] bombing, in and of itself, is, arguably, a fairly distinctive method for intimidating or killing an individual."[46] The court concurs. Moreover, although the bombs were not highly sophisticated, some level of skill was required to construct the bombs. The bombs had a time delay and required knowledge of how to work with an explosive filler, igniter, power source, and wiring. Notably, the Downers Grove bomb misfired due to a wiring error. In the Downers Grove letter, the person referred to the misfire and said "[w]e worked out the ignition problems with that design."[47] This supports that some level of skill was required to construct each of the bombs. Additionally, the particular construction of each bomb appears to show a similar skill level.

The next factor is the distinctiveness of the device. The government purports that each device was a pipe bomb that contained Alliant Blue Dot smokeless powder. The government asserts that "4,233 bombings analyzed by ATF had smokeless powder, [but] only 27 had blue dot smokeless

---

[45] *Huddleston*, 485 U.S. at 685.

[46] *Trenkler*, 61 F.3d at 55 (citations omitted).

[47] Downers Grove Letter (Docket No. 343, Ex. 2).

powder."[48] In *Trenkler*, testimony was admitted about "information retrieved from an ATF computer database of explosives and arson incidents."[49] The appellate court found it was error to admit the testimony about results from the database due to reliability and trustworthiness issues.[50]

In this case, the government has not stated the source of its data, so it is unclear whether it will be admissible. If the information was from a database, the government has not stated what criteria were required for inclusion of data in the databases or whether there were methods used to verify the accuracy of the information. Without additional information, the court is unable to determine if this piece of evidence has the necessary indicia of reliability. Accordingly, the court cannot use that evidence in its analysis of distinctiveness at this time.[51] Beyond the Alliant Blue Dot smokeless powder, the government has not pointed to any other distinct characteristic of the pipe bombs at issue in this case that distinguish them from other pipe bombs.

The government does point to other evidence, though, about the bombings. First, the government points to similarities between the bomb components. None of the bombs are exactly the same. As stated above, however, the bombs do not have to be identical. Rather, they just must be sufficiently similar to constitute signature quality. The Downers Grove bomb and Salt Lake City bomb each had galvanized end caps, Alliant Blue Dot smokeless powder, 22 American Wire Gauge

---

[48] Summary of Prior Acts, at 2 (Docket No. 343, Ex. 1)

[49] *Trenkler*, 61 F.3d at 49–50.

[50] *Id.* at 57.

[51] If the government comes forward with admissible evidence demonstrating the reliability of its information about how frequently blue dot smokeless powder is used in comparison to other powders, such evidence, arguably, would show the three bombs at issue here were distinctive from other bombs.

black insulated wiring, and solder used on copper wires.[52]  The Downers Grove bomb differed from the Salt Lake City bomb in that it:  misfired, used a different type of pipe, had a different type of timer and time delay, had a different diameter drill hole in the end cap, used a different adhesive, was not attached to cardboard, used yellow and white masking tape, had 16 American Wire Gauge green insulated wire as well, contained no clips to attach wires, used four AA alkaline cell batteries rather a one 9-volt battery, and used an Estes igniter attached to masking tape rather than what appears to be an Estes igniter coupled with a green pyrotechnic fuse and flare fuse.[53]  In other words, there are four similarities and twelve differences in the bomb components.  This factor weighs against the two bombs being constructed by the same person.

In contrast, the government points to the following similarities between the Hinsdale bomb and the Salt Lake City bomb:  both exploded; used Alliant Blue Dot smokeless powder; used an egg timer with the same time delay, although the egg timers were different brands; had the same size drill holes in the end plate; used the same type of adhesive; attached the bomb to cardboard; did not use tape; used the same type of wiring; used clips to attach the wires; and used one 9-volt alkaline battery, although the batteries were different brands.[54]  Besides the different brands for the egg timer and batteries, these two bombs differed in the following respects: a different pipe and end caps were used, no soldering was present on the Hinsdale bomb, the clip on the Hinsdale bomb did not have a rubber cover, and a different igniter/fuse was used.[55]  Thus, for the Hinsdale bomb, there are eleven

---

[52]  *See* Summary of Prior Acts (Docket No. 343, Ex. 1).

[53]  *Id.*

[54]  *Id.*

[55]  *Id.*

similarities between the two bombs, and about four differences. This factor weighs in favor of the two bombs being constructed by the same person.

Next, the government points to a seeming pattern with the bombings. Each bombing was preceded by a police encounter with Zajac or a member of his family. Each encounter, however, occurred one to two years before the bombing. Thus, while this may be a factor, it is weakened due to the length of time between the bombing and the encounter. After each bombing, the police chief in the city where the bombing occurred received a threat letter. The Downers Grove letter was sent about a year after the bombing, though, whereas the Hinsdale and Salt Lake City letters were sent within about one month. Additionally, little similarity exists in phraseology between the Downers Grove letter and the Salt Lake City letter. While both letters pertain to bombings, only the Downers Grove letter references a specific plan for a bombing that was to occur the next day. That "plan" also significantly differentiates the letter from the Salt Lake City letter. In contrast, there are a number of similar phrases between the Hinsdale letter and the Salt Lake City letter, which given the brevity of the letters, may indicate the two letters were authored by the same person.[56]

The bomb components and threat letters provide more particularized evidence than geography, skill level, and uniqueness of the device in this case. Accordingly, the court gives more weight to that evidence. Based on the totality of the comparisons, the court concludes there is not sufficient similarity between the Downers Grove bombing and the Salt Lake City bombing for the Downers Grove evidence to be admissible. There is, however, sufficient similarity between the

---

[56] The court also notes that fingerprints were found on the Hinsdale letter and on a remnant of the Salt Lake City bomb that have been identified as Zajac's. Although the court has not determined whether this evidence is admissible, if it is admitted, it too will go to establishing identity. The government should be prepared to address the admissibility of the Hinsdale fingerprints at the evidentiary hearing scheduled for September 13, 2010.

Hinsdale bombing and the Salt Lake City bombing that a jury could reasonably conclude the two bombings were committed by the same person. The bombings also are relevant as to the person's knowledge and skill.

### 3. Prejudice and Limiting Instruction

Although the court has concluded that the Hinsdale bombing evidence is being offered for a proper purpose and that the evidence is relevant, the court must look at whether the evidence is unfairly prejudicial. "Evidence of prior bad acts will always be prejudicial, and it is the trial court's job to evaluate whether the guaranteed risk of prejudice outweighs the legitimate contribution of the evidence."[57] "The exclusion of evidence under Rule 403 . . . is an extraordinary remedy and should be used sparingly."[58] Only if there is substantial disparity between the prejudice and the probative value should evidence be excluded.[59] Zajac denies being involved in the Salt Lake City bombing. Evidence in the Hinsdale bombing is probative on the issue of identity, which is a key element in this case. Because identity is a key element, the value of the evidence is high. While it also carries a risk of prejudice, that risk does not substantially outweigh the legitimate contribution of the evidence. Moreover, if requested, the court will give a limiting instruction regarding use of the evidence.

Zajac also contends, however, that introduction of the Hinsdale bombing is unfairly prejudicial because it will necessitate another delay in the trial so he can investigate the evidence more completely and conduct a *Daubert* hearing on the Hinsdale evidence. Moreover, introduction of this evidence will complicate the trial. The court agrees that introduction of the evidence will

---

[57] *Shumway*, 112 F.3d at 1422.

[58] *Mares*, 441 F.3d at 1159 (quotation marks and citation omitted) (ellipses in original).

[59] *United States v. Ward*, 182 Fed. Appx. 779, 790 (10th Cir. 2006) (citations omitted).

complicate the trial and it may result in another continuance if Zajac seeks additional time. The question here, though, is whether these factors create undue prejudice.

Zajac has been indicted for the Hinsdale bombing, thus, the case is no longer in the investigatory stage and evidence should be available for examination. The time needed to examine this additional evidence should not be lengthy, especially since it appears that some of the same experts testifying about the Salt Lake City bombing will testify about the Hinsdale bombing. While additional evidence will complicate the trial, the evidence is not so complex that a jury will be unable to sort out the details.

The court therefore concludes that the government may introduce evidence of the Hinsdale bombing for purposes of establishing identity, knowledge, and skill, but it is subject to the following limitations. The government may introduce evidence of the police officers' encounter with Zajac's son and Zajac's conduct towards the Hinsdale police officers because these are the alleged triggering events for the Hinsdale bombing and may provide context for the contents of the Hinsdale letter. The government may not reference, however, Zajac's conduct towards his wife because the government has not shown a pattern of domestic abuse. Moreover, the court concludes that evidence would be unduly prejudicial to Zajac. More information must be presented before the court can determine whether the fingerprint analysis from the Hinsdale bombing is admissible and whether the frequency of blue dot smokeless powder use is admissible. Use of James Fitzgerald's testimony regarding the Hinsdale letter is limited to that described in the court's decision regarding authorial attribution.

The court recognizes that an additional *Daubert* hearing *may* be needed to address expert testimony about the Hinsdale bombing. This ruling does not preclude such a challenge, nor the possibility that additional evidence may be excluded as a result of a *Daubert* hearing. Finally,

because the court's ruling is based on the government's representation of what the evidence will be, "relevancy of [the] evidence depends upon the fulfillment of a condition of fact."[60]  Should this condition not be met at trial, the court will instruct the jury to disregard the evidence.

### C.  Other Acts

#### i.  Proper Purpose

Zajac has been involved in three prior incidents where his identity is not largely in dispute. First, he made threatening statements to an Aurora, Illinois police officer in 1999 ("Telephone Threat Matter").  Next, he sent harassing letters and engaged in disorderly conduct in 2003 ("Disorderly Conduct Matter").  Finally, in 2004 he damaged a toll collection device after he was fined for not paying the tolls ("Property Damage Matter").  The government proposes to introduce this evidence to show "intent, motive, state of mind and *modus operandi*."[61]  Both intent and motive constitute a proper purpose according to Rule 404(b).  The Tenth Circuit also has recognized that state of mind and *modus operandi* are proper purposes as well.[62]  The government has therefore articulated a proper purpose for admitting the evidence.

#### ii.  Relevancy

With respect to relevancy, the government contends these other acts are relevant because they "prove the defendant's intent, motive and state of mind that someone must pay or to strike fear of future harm in retaliation for the perceived wrongs against him or his family, through threats or acts

---

[60]  Fed. R. Evid. 104(b).

[61]  Gov't 404(b) Opp. Memo., at 31–32 (Docket No. 343).

[62]  *Zamora*, 222 F.3d at 762 (stating that "state of mind" evidence "clearly" falls within proper purpose); *United States v. Salcido-Luzania*, No. 97-2399, 1999 U.S. App. LEXIS 5882, at *20 (10th Cir. Mar. 31, 1999) (introducing evidence to establish *modus operandi* is a proper purpose).

of violence, including damaging property."[63]  Relevancy is dependant upon the similarity between the prior bad acts and the present charge.  While Zajac appears to react in a threatening or even violent way to perceived wrongs, there is no consistent *modus operandi* among the prior acts, nor between these prior acts and the bombings.  In the Disorderly Conduct Matter, Zajac damaged a person's home and sent a harassing letter.  In the Property Damage Matter, Zajac poured glue down a toll collection device, but made no verbal or written threats.  In the Telephone Threat Matter, Zajac made verbal threats, but took no action other than making the verbal threats.

Of these prior acts, the Telephone Threat Matter is the most similar to the Hinsdale and Salt Lake City bombings.  In the Telephone Threat Matter, Zajac indicated that because the officer had dealt with his son, the officer must now deal with Zajac.  Additionally, Zajac threatened to kill the officer's supervisor.  These statements and threats have a similar tone to the Hinsdale and Salt Lake threat letters, but the similarity is minimal and has little relevancy.

       iii.   <u>Prejudice</u>

Even if these other acts were relevant, their probative value does not outweigh the risk of unfair prejudice.  In *United States v. Commanche*, the Tenth Circuit held that relevancy cannot "depend on a defendant likely acting in conformity with an alleged character trait."[64]  Using prior "bad acts to demonstrate conformity with a particular character trait is prohibited because it is prejudicial."[65]  The defendant in *Commanche* used a box cutter against an opponent when the opponent attacked him.  The defendant alleged he used the box cutter in self-defense.  The

---

[63]  Gov't 404(b) Opp. Memo., at 32 (Docket No. 343).

[64]  *United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009).

[65]  *Id.*

government introduced evidence, however, that the defendant had been twice "convicted of battering people in the past using a sharp object."[66]  The court concluded that the evidence was admitted in error because it had "no direct bearing on whether [the defendant] acted in self defense."[67]  Rather, it went towards showing the defendant "acted in conformity with a violent predisposition."[68]

Here, the common theme running throughout Zajac's prior acts is that he threatens and reacts violently at times.  To link this evidence with the Salt Lake City bombing, one must infer that Zajac acted in conformity with this propensity.[69]  Thus, a link in the chain of inferences is based on impermissible character evidence.  This, coupled with the dissimilarities between these other acts and the Salt Lake City bombing, necessitates exclusion of this evidence at trial.

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part Zajac's motion to exclude 404(b) evidence.[70]  The court excludes all 404(b) evidence, except evidence of the Hinsdale bombing.  Although the government may introduce evidence from the Hinsdale bombing, it is subject to the limitations stated in this memorandum decision and order.  The court notes again that the government should be prepared to address the admissibility of the Hinsdale fingerprints at the evidentiary hearing scheduled on September 13, 2010.

---

[66]  *Id.* at 1268.

[67]  *Id.*

[68]  *Id.* at 1269.

[69]  *See id.* at 1267.

[70]  Docket Nos. 51, 57, and 289.

DATED this 2$^{d}$ day of September, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge