IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS JAMES ZAJAC,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER<br>RE: AUTHORIAL ATTRIBUTION**<br><br>Case No. 2:06-cr-00811 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

This matter is before the court on Defendant Thomas James Zajac's motion to exclude expert testimony regarding authorial attribution. A *Daubert* hearing was held on March 1, 2010 through March 4, 2010 during which testimony was taken from James R. Fitzgerald regarding three written communications and three envelopes that he analyzed. Briefing on the motion was completed on June 29, 2010 and final oral argument was heard on July 26, 2010. The court grants in part and denies in part Zajac's motion to exclude Fitzgerald's testimony about the three written communications and envelopes.

## FACTUAL BACKGROUND

**Fitzgerald's Testimony**

Fitzgerald has a bachelors degree in law enforcement and corrections, and masters degrees in linguistics and human organizational science.[1] From 1976 until 1987, Fitzgerald worked for the

---

[1] Curriculum Vitae of James R. Fitzgerald, 2 (Gov't Hr. Ex. 4).

police department in Bensalem, Pennsylvania.[2]  He then worked for the Federal Bureau of Investigation from 1987 through 2007, where he "[d]esigned and implemented the FBI's Communicated Threat Assessment Database (CTAD)."[3]  CTAD is "a software-based program which is now the primary repository for all threatening communications received by the FBI."[4]  Functionally, the database is used "to categorize, catalogue, and facilitate advanced searches of all threatening communications for purposes of determining threat level and authorship of incoming communications."[5]

Since retiring from the FBI, Fitzgerald has worked as a violent crime consultant and forensic linguist expert.[6]  He teaches courses and lectures on the topic of forensic linguistics.  During his career with the FBI and as a consultant, he has worked on 3,000 to 4,000 cases and, in part uses that experience to form his opinions about what features are unusual in a writing sample.[7]  In 50 or 60 cases, he has specifically looked at whether documents were authored by the same person.[8]  Moreover, Fitzgerald has been allowed to testify as an expert on forensic linguistic issues.[9]

While employed with the FBI, Fitzgerald conducted an analysis of three letters and envelopes

---

[2]  *Id.* at 3.

[3]  *Id.*

[4]  *Id.*

[5]  *Id.*

[6]  *Id.* at 2.

[7]  Hr. Tr., 241:16–242:9 (Docket No. 372).

[8]  *Id.* at 239:9–15.

[9]  Curriculum Vitae of James R. Fitzgerald, 6 (Gov't Hr. Ex. 4).

at issue in this case and issued a "Forensic Linguistic/Authorial Attribution Report."[10] Fitzgerald testified that he follows the basic protocol or methodology in Dr. Gerald R. McMenamin's book, *Forensic Linguistics: Advances in Forensic Stylistics*, when doing an analysis.[11] Fitzgerald also has added to this methodology use of "different colored pens to mark different kinds of linguistic phenomenon."[12] Fitzgerald did not provide the court with the criteria he uses to identify these "linguistic phenomena" nor classes of phenomena. He also did not identify the criteria that are recognized generally in the field of linguistics to make these determinations.

In conducting his analysis in this case, he presumed that the case information he had been provided was valid, and therefore, his "analysis could be modified or changed should the investigation . . . invalidate the original information."[13] The case information he accepted as true at the time he conducted his analysis was that a pipe bomb explosion in Salt Lake in 2006 was similar to two bombings in Illinois; the letters he was analyzing pertained to those bombings; a latent print found in the Salt Lake bombing materials was identified as Zajac's, and Zajac's trial was scheduled to start shortly.[14] It is unclear the extent to which the opinions he would offer at trial depend upon these assumptions being proven to be true.

---

[10] Supervisory Special Agent James R. Fitzgerald, Forensic Linguistic/Authorial Attribution Report (Def's Hr. Ex. 1) (hereinafter "Fitzgerald Report").

[11] Hr. Tr., 239:16–19 (Docket No. 372).

[12] *Id.* at 261:12–262:5.

[13] Fitzgerald Report, at 2 (Def's Hr. Ex. 1). The court notes that Fitzgerald may not testify about this case information because it is outside the scope of his personal knowledge and his area of expertise.

[14] *Id.* at 3.

In the report, Fitzgerald did not attempt to identify the author of the letters. Instead, he only attempted to determine if there was common authorship.[15] After discussing how speech and writing styles differ among individuals, Fitzgerald stated that "no two individuals use words, or groups of words, precisely the same way."[16] He does not cite to any accepted linguistic literature or studies to support this assertion. He noted, though, that "the more text available to compare and review, the more accurate the results, and the stronger the rendered opinion."[17] Although Fitzgerald only had three one-page letters and three envelopes to review, he concluded "there [was] enough in the way of idiosyncratic points of stylistics and distinctive content and context and/or lexical features that a reliable opinion can be rendered."[18]

Fitzgerald looked at both external evidence and internal evidence. The envelopes were classified as external evidence for which he noted the following:

> [E]ach address is keystroked in standardized upper and lower case. Each listed destination city is followed by a comma before the listing of the state. Each state is abbreviated using official U.S. Postal Service state abbreviations. [The Hinsdale and Salt Lake City envelope] addresses are both centered. There are no return addresses, real or bogus, on any of the envelopes. It is noted that the postage stamps are different on each envelope.[19]

Fitzgerald testified that an additional similarity existed because each envelope also was addressed

---

[15] *See id.* at 9.

[16] *Id.* at 2.

[17] *Id.* at 3.

[18] *Id.*

[19] *Id.* at 4.

to the Chief of Police in the city where the bombing occurred.[20]  A review of the envelopes shows the Downers Grove letter was addressed to "Attn: Chief of Police," the Hinsdale letter was addressed to "Chief," and the Salt Lake City letter was addressed to "Chris Burbank."[21]

For the internal evidence, Fitzgerald looked at six categories.  The first was general observations.  Fitzgerald concluded that each letter contained "very good writing/compositional skills" and "follow[ed] virtually all the rules of prescribed grammar."[22]  Each letter appeared to be written by a native English speaker who was mid-thirties or older in age.[23]

Fitzgerald next looked at punctuation.  Fitzgerald found that all three "documents consistently uses punctuation in a standardized format.  There is no consistent overuse, underuse, or misuse of any marks of punctuation."[24]  Fitzgerald noted the use of a colon in each letter, and a description of something that would happen after the colon.[25]

Third, Fitzgerald looked at orthography (spelling), and found there were no words misspelled, but two words were misused.  In the Hinsdale letter, the author used "loose" in place of "lose," and in the Salt Lake City letter the author used "to" in place of "too."[26]  No consistency of misused words was found across the three documents.  Rather, in the Hinsdale letter where the author misused

---

[20]  Hr. Tr., 275:23–276:3 (Docket No. 372).

[21]  Letters (Docket No. 343, Ex. 2).

[22]  Fitzgerald Report, at 5 (Def's Hr. Ex. 1).

[23]  *Id.*

[24]  *Id.*

[25]  *Id.* at 5–6.

[26]  *Id.* at 6; *see also* Hinsdale and Salt Lake City Letters (Docket No. 373, Ex. 2).

"loose," he used both "too" and "to" correctly in the document.[27]  Fitzgerald does not address

whether these misuses may be explained by the author's use of a spell checker function in a word-

processing program.

Fourth, Fitzgerald looked at grammatical aberrations.  He found there were "few non-

standardized grammatical forms present in the three" letters.[28]  He did find "one notable observation

of somewhat idiosyncratic grammatical usage is the habit of the author of all three [letters] to begin

some sentences with the word 'and.'"[29]

Fifth, Fitzgerald looked at semantical and syntactical associations.  He found each letter had

a consistent theme and topic.  Of the nine examples he gave, however, seven of them addressed

consistency only between the Hinsdale letter and the Salt Lake City letter and not the Downers Grove

letter.  At the *Daubert* hearing, Fitzgerald testified that thematically, all of the letters dealt with a

bomb.[30]  Additionally, each letter stated (1) something the police had done wrong, (2) a threat about

something that would happen, and (3) made a reference to an earlier bombing.[31]

Finally, Fitzgerald's looked at miscellaneous items.  In this category, Fitzgerald found each

letter was about the same length; each used profanity; use of numbers and dates were similar (again

mainly in the Hinsdale and Salt Lake City letters); and the Downers Grove and Salt Lake City letters

---

[27]  Hinsdale Letter (Docket No. 343, Ex. 2).

[28]  Fitzgerald Report, at 6 (Def's Hr. Ex. 1).

[29]  *Id.*

[30]  Hr. Tr., 278:17–279:1 (Docket No 372).

[31]  *Id.* at 253:19–25.

both used an asterisk to signal a footnote.[32]  Among all the 2,500 plus documents in CTAD, only two

used an asterisk in this manner.  Fitzgerald stated, "this use of an asterisk was very, very odd and

unusual."[33]  Based on the totality of these factors, Fitzgerald rendered an opinion, "with a likelihood

bordering on certainty,"[34] that the three letters "were authored by the same person."[35]

At the *Daubert* hearing, Fitzgerald testified that to reach a conclusion, there is no minimum

number of features that have to be present.[36]  Additionally, he did not focus on what is or is not

allowed in linguistics.  Rather he focused on "what is more commonly accepted or preferred in

formal writing situations."[37]  Other than his experience, Fitzgerald offered no basis upon which he

was making the comparison that led to this conclusion.

**Eggington Testimony**

Zajac called William Gregory Eggington ("Eggington") to testify about linguistics.

Eggington has a bachelor's degree in English and a master's and doctorate degree in linguistics.[38]

He is "a professor of linguistics at Brigham Young University and chair of the linguistics

---

[32]  Fitzgerald Report, at 7–9 (Def's Hr. Ex. 1).

[33]  Hr. Tr., 254:25–255:1 (Docket No. 372).

[34]  This conclusion was "based on a scale of 'no discernible association', 'possible,' 'likely,' 'highly likely,' 'very highly likely,' and 'with a likelihood bordering on certainty.'" Fitzgerald Report, 9 (footnote) (Def's Hr. Ex. 1).

[35]  *Id.* at 9.

[36]  Hr. Tr., 247:12–14 (Docket No. 372).

[37]  *Id.* at 288:20–23.

[38]  Hr. Tr., 638:4–7 (Docket No. 373).

department."[39] Additionally, he has done "forensic linguistics work across the whole spectrum of federal and state cases and civil and criminal cases."[40] Eggington heard Fitzgerald testify and he reviewed his report.

Eggington testified that people "suppress our idiolect, especially in writing."[41] Consequently, he believes Fitzgerald's construct is problematic.[42] Eggington bases his conclusion, in part, on a study done by Carole Chaski. At the foundation of Chaski's study was the case of *Van Wyk*.[43] In that case, the court refused to allow Fitzgerald to testify who the author was of certain documents because the opinion failed to meet required standards.[44] Accordingly, Chaski set out to determine what the standards were for authorial attribution, and she looked at the error rate to help set the standard, rather than submitting "junk science" to the court.[45]

Chaski looked at different markers and found that two attributes had "statistically significant association."[46] One was phrase structure and the other was sentential punctuation, "[m]eaning punctuation aligned with a particular clause unit or phrasal unit."[47] Once Chaski found relevant

---

[39] *Id.* at 638:10–12.

[40] *Id.* at 639:6–9.

[41] *Id.* at 641:22–24.

[42] *See id.* at 642:4–9.

[43] *See id.* at 664:17–665:1.

[44] *Id.* at 642:14–643:2; *see also Van Wyk*, 83 F. Supp. 2d 515, 523 (D.N.J. 2000).

[45] Hr. Tr., 643:3–15 (Docket No. 373).

[46] *Id.* at 643:17–644:3.

[47] *Id.* at 644:3–6.

markers, she then reduced the size of the sample group incrementally and learned that to make an accurate authorial attribution, one needs at least five sample documents.[48]  Another study used different markers, but reached the same conclusion.[49]  When smaller samples are used, error rates need to be factored in.[50]  Error rates can be determined by several people doing a blind case analysis and then comparing their rate of agreement to determine reliability.[51]

Eggington also testified about problems with the CTAD database because it does not have baseline data of known authors.[52]  Consequently, matches to the data that exist in the database lack validity.[53]  Additionally, because Fitzgerald created the database, at times, there is a subconscious, experimental bias.[54]  Consequently, Fitzgerald should have used an outsider to run the analysis to control for this potential bias, according to Eggington.[55]  Eggington did review, however, some of the statistical information in the database and found that the three letters at issue were average in length when compared to other letters in the database.[56]

---

[48] *Id.* at 644:7–14.  Eggington did not explain whether authorial attribution, as used by him and Chaski, is directed at identifying a specific author or whether it may also include a conclusion that the same, but unidentified author, wrote one or more of the documents being compared to a sample.

[49] *Id.* at 644:15–20.

[50] *Id.* at 648:5–12.

[51] *Id.* at 648:22–649:8.

[52] *Id.* at 646:23–647:7.

[53] *Id.* at 647:7–12.

[54] *Id.* at 655:21–656:19.

[55] *Id.* at 656:10–19.

[56] *Id.* at 651:18–652:3.

He further testified that Fitzgerald's conclusions were faulty because the distinctions he made to identify a match were all based on standard usage, or in other words what everyone else does.[57] Additionally, Eggington said that Fitzgerald did not control for the null hypothesis. Although he pointed to features that supported his hypothesis, he failed to account for those that did not.[58] To support this contention, Eggington pointed to Fitzgerald's analysis of the colon punctuation that appeared in each of the letters, and that Fitzgerald did not mention it was used in a different fashion both in the language before and after the colon.[59]

Eggington testified that Fitzgerald also did not point out the grammatical differences, such as the Hinsdale letter using the subjunctive "would" three times, but neither of the other letters using it.[60] Fitzgerald also did not mention that the Downers Grove letter refers to "we," and the other two letters refer to "I."[61] He said these deficits in his report show "he had a bias."[62] Eggington further said that the information Fitzgerald received about the case before he began his analysis also lead to bias and that Fitzgerald should have had another do the analysis who did not have the information.[63]

---

[57] *See id.* at 652:4–653:23. Part of the standardization that Eggington referred to pertained to the envelopes that Fitzgerald examined and said were similar when they merely followed standard usage. *Id.* at 653:4–9.

[58] *Id.* at 654:1–24.

[59] *Id.*

[60] *Id.* at 657:18–21.

[61] *Id.* at 658:4–7.

[62] *Id.* at 657:21–22.

[63] *Id.* at 660:11–20.

Eggington testified that one can only identify similarities and linguistic characteristics between the three letters and no idiosyncrasies because the sample size was too small.[64] Idiosyncrasies go to a person's idiolect[65] and cannot be determined from three documents.[66] At the conclusion of his testimony, he opined that Fitzgerald should have used CTAD to identify, for example, how many times threat letters have an "opening move" of using profanity.[67] Absent such information, one cannot determine whether the letters had distinctive characteristics.[68]

## ANALYSIS

## I.      STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education" may testify about "scientific, technical, or other specialized knowledge" if it will assist a jury "to understand the evidence or to determine a fact in issue,"[69] provided the following conditions are met:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[70]

---

[64]  *Id.* at 663:19–664:16.

[65]  "Idiolect" is "a personal dialect;"  it is how "we speak and the way we write."  Hr. Tr., 234:24–235:4 (Docket No. 372).

[66]  Hr. Tr., 668:11–20 (Docket No. 373).

[67]  *Id.* at 669:4–21.

[68]  *Id.* at 669:18–21.  Thus, Eggington first opined that Fitzgerald improperly used CTAD to draw a conclusions because it lacked a proper baseline, but then he opined Fitzgerald should have used the database more to draw statistical comparisons.

[69]  Fed. R. Evid. 702.

[70]  *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702).

The Supreme Court has noted that "no clear line" exists "between scientific knowledge and technical or other specialized knowledge."[71] "And conceptual efforts to distinguish" scientific from technical knowledge "are unlikely to produce clear legal lines capable of application in particular cases."[72] As a result, the factors listed in *Daubert* to determine reliability also may have applicability in cases relying on technical or other specialized knowledge.[73] Those factors include looking at whether the theory or technique: (1) "can be and has been tested," (2) "has been subject to peer review and publication", (3) has a "known or potential rate of error", (4) has standards that control "the technique's operation," and (5) "has achieved general acceptance in the relevant scientific or expert community."[74]

The factors are not exclusive and should be applied flexibly.[75] The Advisory Committee Notes to Rule 702 state that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."[76] The notes then cite a case where testimony from a handwriting expert was admitted based more on experience.[77] Although a handwriting analysis is not the same as Fitzgerald's work, it has similar attributes. Therefore, by application, Fitzgerald's experience can bear on the reliability of his opinion.

---

[71] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999) (quotation marks omitted).

[72] *Id.* (citations omitted).

[73] *Id.* at 141.

[74] *Baines*, 573 F.3d at 985 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)).

[75] *Kumho Tires*, 526 U.S. at 141.

[76] Fed. R. Evid. 702, Advisory Committee Notes (2000)

[77] *Id.* (citing *United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997)).

Finally, it is important to note that the Rules of Evidence have a "liberal thrust,"[78] such that there is a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact."[79]  Thus, "rejection of expert testimony has been the exception rather than the rule."[80]  Even "lack of bias is not required for expert testimony to be admissible."[81]  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[82]  Nevertheless, the court still has a gatekeeper role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[83]  This gatekeeper role is not limited to scientific evidence, but applies to all opinion testimony, including opinion based on the witness's technical or other specialized knowledge.  Because the government is the proponent for admitting Fitzgerald's testimony, it bears the burden of establishing by preponderance of the evidence that his testimony is admissible.[84]

---

[78]  *Daubert*, 509 U.S. at 588 (quotation marks and citations omitted).

[79]  *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995) (quotation marks and citation omitted).

[80]  *Ruff v. Ensign-Bickford Indus., Inc.*, 171 F. Supp. 2d 1226, 1232 (D. Utah 2001) (citing *Goebel v. Denver & Rio Grand W. R.R. Co.*, 215 F.3d 1083, 1089 (10th Cir. 2000)).

[81]  *Lippe v. Bairnco Corp.*, No. 96 Civ. 7600, 2003 U.S. Dist. LEXIS 1133, at *48 (S.D.N.Y. Jan. 28, 2003) (citation omitted).

[82]  *Daubert*, 509 U.S. at 596 (citation omitted).

[83]  *Id.* at 589.

[84]   *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citations omitted).

## II.    APPLICATION OF STANDARD

### A.    Fitzgerald's Qualifications

In *Van Wyk*, the court concluded that "Fitzgerald has had rather extensive experience in text analysis," and "arguably qualifies as an 'observational' expert because he has examined so many examples over an extended period of time."[85]  The decision was rendered more than ten years ago. Since that time, Fitzgerald has obtained a Master's in Linguistics from Georgetown University and has continued his work examining documents and lecturing on forensic linguistics.  Thus, his experience and education have increased over the intervening years.  Zajac does not appear to dispute Fitzgerald's experience.  Rather he contends that Fitzgerald is biased and lacks credibility.  Those factors go to the weight of Fitzgerald's testimony and not to its admissibility.  The court therefore concludes that Fitzgerald has the requisite experience and education to qualify as an expert.

### B.    Sufficiency of Facts or Data

To reach a valid conclusion, an expert must have "an underlying basis of support."[86]  In *Kashuba*, the court reviewed an expert report, wherein the expert opined that police used excessive force.[87]  In forming this conclusion, the expert reviewed no deposition testimony or police reports. She did not interview the plaintiff, nor review his complaint or criminal history.[88]  Rather, she relied

---

[85]  *Van Wyk*, 83 F. Supp. 2d at 520 (citation omitted).

[86]  *Kashuba v. City of Adamsville*, No. CV 01-B-0067, 2002 U.S. Dist. LEXIS 28218, at *9 (N.D. Ala. Sept. 9, 2002) (quotation marks and citation omitted).

[87]  *Id.* at *3–4.

[88]  *Id.* at *4.

solely on facts she received from the plaintiff's attorney.[89] The court concluded her report lacked sufficient facts or data to support her conclusion.[90] In *United States v. Tin Yat Chin*, the court likewise excluded expert testimony on the same basis. The case involved identification of an impersonator who had a Mandarin accent. The expert opined the defendant, "a native Cantonese speaker, could not have faked the Mandarin accent attributed to the impersonator."[91] She formed this opinion based on an interview with the defendant's brother and a twenty-five minute interview with the defendant, "during which he spoke for only fifteen seconds in Mandarin."[92] The court concluded she should have interviewed other individuals who knew the defendant and conversed with him longer in Mandarin.[93]

In both opinions, the expert had other sources available to gain facts and data, but simply ignored them when forming their conclusions. By limiting their source of information, it weakened the foundation of their opinions. Here, Fitzgerald was given a specific number of documents and asked to examine them. No additional documents were available, no witnesses or interviews were necessary to the examination, and there was no known author from whom to obtain an exemplar.

Zajac, nevertheless, contends that Fitzgerald cannot form an opinion about authorial attribution because linguistic studies indicate that one must have at least five documents to render a valid conclusion. Zajac relies on the testimony of Eggington for this proposition. Eggington

---

[89] *Id.* at *9.

[90] *Id.* at *10.

[91] *United States v. Tin Yat Chin*, 371 F.3d 31, 33 (2d Cir. 2004).

[92] *Id.* at 37.

[93] *Id.* at 40.

testified at length about a study that Chaski conducted. Chaski undertook that study because the court excluded Fitzgerald's testimony about authorial attribution in the *Van Wyk* case.[94] Specifically, this meant that Fitzgerald was not permitted to testify about his conclusion regarding "the identity of the author of the unknown writings."[95] He was permitted to testify about "the specific similarities and idiosyncracies between" the documents, and about "how frequently or infrequently in his experience, he has seen a particular idiosyncrasy."[96] Eggington was unaware Fitzgerald was permitted to testify on this more limited ground.

This distinction is critical, though, because Chaski's study only applied to the topic before her, namely, how many documents are required before one can make a valid author identification. In this case, Fitzgerald is not seeking to offer an opinion that Zajac was the author. Thus, one cannot extrapolate from Chaski's study that because five documents are required for valid author identification so too are five documents required before one can identify similarities or idiosyncracies between documents. Based on Fitzgerald's experience, the court cannot conclude Fitzgerald lacked sufficient information on which to form an opinion about similarities and idiosyncracies between the letters themselves. The scope of this conclusion is narrow and limited by the following exclusions.

Regarding Fitzgerald's "general observations", he has provided insufficient information to opine that the author(s) is a native English speaker or a non-native speaker who has mastered English through years of study. He also has failed to provide sufficient information to opine the author(s)

---

[94] *See Van Wyk*, 83 F. Supp. 2d at 523.

[95] *Id.*

[96] *Id.* at 524.

is in his or her mid-thirties or older. Moreover, Fitzgerald has pointed to no unique attributes of the envelopes. For example, while each one used a comma after the city and before the state, this is so standard as to be unremarkable. Additionally, there is more dissimilarity than similarity regarding how the Chief of Police is addressed on each envelope for Fitzgerald to opine on this issue. Accordingly, the court holds that Fitzgerald cannot testify that the author(s) is a native English speaker in his or her mid-thirties or older. He also may not testify about any similarities between the envelopes. This does not mean Fitzgerald cannot refer to the envelopes to discuss how he ordered the letters.

As to authorship, Fitzgerald offered no linguistic support that one can reach a conclusion that the same author, although unidentified, wrote the documents based on a complete data field of only three documents. The proponent of the opinion to be offered has the burden to provide a basis in his or her field of expertise that would support the conclusion. Although experience may provide such a basis, Fitzgerald points to nothing in his experience that supports his ability to draw such a conclusion based on so few documents, or for that matter, based upon any number of documents.

### C. Product of Reliable Principles and Methods

Because Fitzgerald's experience lends support that he had sufficient information on which to form an opinion about similarities and idiosyncracies between the letters themselves, the court must address the second prong under Rule 702. Zajac contends that Fitzgerald's principles and methods are unreliable because he varied the McMenamin protocol by using different colored pens, he failed to conduct blind studies, Fitzgerald knew of no error rate in the field, and his conclusions were not submitted to true peer review, but only reviewed by two colleagues. In other words, Zajac contends that Fitzgerald's principles and methods are not reliable because he failed to follow strict

scientific methods. *Kumho Tires* states a "court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability."[97] Again, however, those factors "are merely guidelines" and "reliability concerns may focus on personal knowledge or experience rather than strict scientific methods."[98]

While it is true that Fitzgerald uses different colored pens, he nevertheless follows the basic protocol of McMenamin. There is no evidence of how the use of colored pens, especially without identifying the criteria used, would affect the results intended by following the protocol. Moreover, Fitzgerald has authored four publications on forensic linguistics, including a handbook for the FBI on basic protocols of how to assess communications.[99] He teaches and uses these protocols, and also applies general grammar and linguistic rules to his analysis.

In Chaski's study, she focused on authorship identification. One step in this process is finding a relevant marker and then noting similarities and differences between documents. Chaski found the "phraseology" marker particularly relevant. Although Fitzgerald did not attempt to identify the author of the documents, he too looked at phraseology and noted similarities and perceived idiosyncrasies. Thus, the steps that Fitzgerald took are recognized and used in his field of endeavor. The attacks that Eggington made on Fitzgerald's methods and bias again go more towards application and weight than invalidation of the protocol as a whole.

---

[97] *Kumho Tires*, 526 U.S. at 141.

[98] *WeddingChannel.com, Inc. v. Knot, Inc.*, No. 03 Civ. 7369, 2005 U.S. Dist. LEXIS 991, at *17 (S.D.N.Y. Jan. 26, 2005) (citation omitted).

[99] *See* Hr. Tr., 229:6–19 (Docket No. 372).

**D.      Proper Application of Principles and Methods**

In *Daubert*, the Supreme Court stated that when reviewing reliability, the court's "'focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.'"[100] While that is generally true, in a later decision, the Court stated that "conclusions and methodology are not entirely distinct from one another.  Trained experts commonly extrapolate from existing data."[101]  Consequently, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[102]

Here, Fitzgerald examined three letters and found each letter contained good writing and composition skills.  Each followed prescribed grammar and used punctuation in a standardized manner, with no consistent overuse, underuse, or misuse of any punctuation marks.  Additionally, he found no misspelled words.  Although Fitzgerald found standardized grammar, punctuation, and spelling throughout the three letters, he testified that just because something is standard, does not make it common.

For example, Fitzgerald observed that the Downers Grove letter and the Salt Lake City letter both used an asterisk to signal a footnote.  He acknowledges that such usage is standard, but opines that it is not common.  As support, he relies upon the assertion that only two other letters in the CTAD database, written by a self-identified author, used an asterisk in this manner.  This basis

---

[100] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (quoting *Daubert*, 509 U.S. at 595).

[101] *Id.*

[102] *Id.* (citations omitted).

provides questionable support. The court has little information about CTAD's construct, search parameters, nature of the letters, and so forth. Moreover, there is no evidence of the criteria used or even who selected the letters for inclusion in CTAD. In *United States v. Trenkler*, the court found that without this information, testimony about database results lacked sufficient indicia of reliability.[103] Additionally, without more information, one cannot use CTAD as a database to support any reasonable inference about whether authors who write using standard usage and punctuation use an asterisk with such rarity to signal a footnote that one could conclude such usage to be idiosyncratic. There is no basis from which the court can conclude that CTAD represents a database of standard usage.

Fitzgerald also points to the use of the word "and." Each letter contained a sentence starting with the word "And." Although Fitzgerald acknowledges this is permissible, he asserts this it is uncommon in his experience. Fitzgerald fails to point to any of his experience that has focused on such usage. Nevertheless, he has many years of experience reviewing documents, and thus, may form a conclusion based on that experience about how common it is to begin a sentence with "And." This is a proper application of principles and methods. Whether Fitzgerald's experience reasonably supports this conclusion can be tested by cross-examination.

Fitzgerald also points out that each letter contains thematic and topical similarities. He points to nine particular phrases to illustrate the similarities. As stated above, however, of the nine examples he gave, only one showed some consistency between the Downers Grove letter and the Salt Lake City letter. It is as follows:

---

[103] *See United States v. Trenkler*, 61 F.3d 45, 59 (1st Cir. 1995).

| Downers Grove letter | Salt Lake City letter |
|---|---|
| Perform your job with respect and dignity for the people you serve and you will save their lives. | . . . about how your men are to conduct themselves in the future. This will save lives of Salt Lake City citizens. |

The court finds that while there is some similarity in the phraseology, it is not significant. Yet, based on the asterisk, use of "And" to begin a sentence, the noted phraseology, and a few lesser items, Fitzgerald rendered an opinion "with a likelihood bordering on certainty," that the Downers Grove letter and Salt Lake City letter were written by the same person. The court finds the analytical gap between the data and opinion proffered too great to be admissible. Accordingly, the court concludes that Fitzgerald may not testify or render an opinion about the Downers Grove letter.

The similarity in phraseology between the Hinsdale letter and Salt Lake City letter is much greater. In two relatively short letters, there are seven noted phrases that are similar between the Hinsdale letter and the Salt Lake City letter. Thus, for these two letters, there is uncommon usage of "And" at the start of a sentence and seven similar phrases. Moreover, both letters (1) reference something the police did wrong, (2) make a threat about something that will happen, and (3) make a reference to an earlier bombing. Due to these similarities, the Hinsdale/Salt Lake City analysis does not suffer from the same analytical gap.

The court is mindful that excluding expert testimony is the exception rather than the rule under the Federal Rules of Evidence. Additionally, to the extent Fitzgerald's conclusion rests on shaky information, Zajac may challenge that information during cross-examination. Accordingly, Fitzgerald will be allowed to testify about similarities between the Hinsdale letter and the Salt Lake City letter. His testimony will merely consist of showing similarities between documents,

identifying the phrasing, punctuation and other usage he believes is similar between documents. His careful parsing and comparison of the two letters may be helpful to a jury. Additionally, Fitzgerald may testify that both letters (1) state something the purportedly police did wrong, (2) make a threat about something that would happen, and (3) make a reference to an earlier bombing.

Regarding authorship, however, due to the lack of support offered by Fitzgerald, there is no apparent basis on which to form an opinion to the level of certainty that Fitzgerald has expressed. In other words, the evidence is not so great that one can conclude with a likelihood bordering on certainty that the two letters were authored by the same person. Thus, the court concludes that Fitzgerald cannot express an opinion about authorship.

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part Zajac's motion to exclude the testimony of Fitzgerald.[104] The court excludes testimony about the Downers Grove letter. Fitzgerald may testify about the similarities between the Hinsdale letter and the Salt Lake City letter, but may not offer the ultimate opinion that the two letters were authored by the same person.

DATED this 2[d] day of September, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[104] Docket Nos. 101 and 129.