IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS JAMES ZAJAC,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER RE: TESTIMONY OF EXPLOSIVE ENFORCEMENT OFFICERS**<br><br>Case No. 2:06-cr-00811 CW<br><br>Judge Clark Waddoups |
|---|---|

## INTRODUCTION

Defendant Thomas James Zajac ("Zajac") is charged with bombing the Salt Lake City Public Library on September 15, 2006. Zajac seeks to exclude the testimony of the explosive enforcement officers that were involved in examining the bomb remnants. A *Daubert* hearing was held on March 1, 2010 through March 4, 2010 during which testimony was taken from Danny Ray Waltenbaugh, Jr. ("Waltenbaugh") regarding his preliminary determination that the device met the statutory definition of a destructive device. Testimony also was taken from Michael Lee Eggleston ("Eggleston") regarding his final determination that the device was a destructive device. Zajac contends these determinations constitute legal conclusions that improperly infringe upon the province of the jury. Briefing on this issue was completed on June 14, 2010 and the court heard oral argument on July 26, 2010. The court grants in part and denies in part Zajac's motion to exclude the officers' testimony.

## FACTUAL BACKGROUND

**Waltenbaugh's Testimony**

Waltenbaugh has been an explosive enforcement officer with the Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") for almost nine years, but has been a bomb technician and explosive fire investigator for about eighteen years.[1] Waltenbaugh is a certified bomb technician through a course conducted by the U.S. Army and Federal Bureau of Investigation ("FBI").[2] He is nationally certified as a fire and explosion investigator by the National Association for Fire Investigators.[3] He also is certified as a senior crime scene analyst by the International Association for Identification.[4] In his career, Waltenbaugh has analyzed between 1,200 to 1,500 destructive devices, including "assisting the Department of Defense in the identification and investigation of explosive devices in Iraq."[5] Waltenbaugh has an associates degree in explosive ordnance disposal; a bachelor's degree in individual studies, with an emphasis on criminal justice; and is obtaining a master's degree in forensic science.[6] He instructs classes on various topics related to explosives, including teaching "methodology and processes for post-blast investigations and measure of destruction."[7]

In September 2006, Waltenbaugh was in Salt Lake City to attend and give a presentation at the International Association of Bomb Technicians and Investigators conference.[8] While in Salt Lake, he was asked to review remnants from the Salt Lake City Public Library bombing to glean

---

[1] Hr. Tr., 137:3–5, 138:6–10 (Docket No. 371).

[2] *Id.* at 137:21–138:5.

[3] *Id.* at 137:18–20.

[4] *Id.* at 137:6–9.

[5] *Id.* at 140:5–13.

[6] *Id.* at 138:19–25.

[7] *Id.* at 139:9–18.

[8] *Id.* at 140:14–141:11.

information for additional leads and investigation.[9] He also was asked to provide a "preliminary opinion as to whether the device would meet the definition of a destructive device."[10]

Waltenbaugh "looked at the various components and the various pieces looking for information that could be related to the device, things related to timing and sequencing issues, construction-type issues, or any types of particular information that could help" in the investigation.[11] He looked at "how each piece fit together in a very general sense and then how they fit together as far as the timing and sequence of the event itself."[12] He testified about identifying various components and why certain items had meaning to the investigation.[13] For example, wires were soldered to a battery. This could have meaning because it typically requires a person to have a soldering iron and it can show "that the device was constructed for a specific purpose or specific manner."[14]

After examining the evidence before him, Waltenbaugh concluded that the components were consistent with a pipe bomb.[15] He also "created a very rough drawing of the components" to show how the pipe bomb may have been constructed.[16] Waltenbaugh's conclusion was merely preliminary because ATF does not issue an official or final opinion until all forensic and other analytical work

---

[9] *Id.* at 141:16–22.

[10] *Id.* at 142:3–5.

[11] *Id.* at 155:1–5.

[12] *Id.* at 155:11–14.

[13] *Id.* at 156:2–162:17.

[14] *Id.* at 157:15–158:19.

[15] *Id.* at 162:18–23.

[16] *Id.* at 163:9–14.

is completed.[17]

**Eggleston's Testimony**

Eggleston has been an explosive enforcement officer with ATF since 1999. He explained that ATF has "a branch called [the] Explosive Technology Branch."[18] The branch's task is to assist local, state, and federal "agencies with the investigation and determination of devices under federal code."[19] Eggleston is part of that branch. He has been a bomb technician since 1997 and has examined a couple of thousand devices in his career, including during a tour in Iraq.[20] He has a Bachelor of Science degree in criminal justice sciences and has taken classes "in the areas of device design construction, post-blast, pre-blast, [and] preventative measures."[21]

He wrote "the final determination as to whether the device and explosion that occurred [in this case] fit the criteria under Federal Code [for a] destructive device."[22] Eggleston's analysis differed from Waltenbaugh's because he not only looked at the device's remnants, but took into account laboratory work and other reports when making his determination.[23] Based upon his examination of the physical evidence and the laboratory reports, Eggleston concluded "the materials submitted for examination are consistent with an improvised explosive weapon commonly known as a pipe bomb and would be properly identified as an explosive bomb. Explosive bombs are

---

[17] *Id.* at 142:13–15.

[18] Hr. Tr., 185:10–11 (Docket No. 371).

[19] *Id.* at 185:13–17.

[20] *Id.* at 186:2–22, 187:8–15.

[21] *Id.* at 186:15–25.

[22] *Id.* at 188:10–13.

[23] *See id.* at 197:17–20, 197:25–198:4.

destructive devices as that term is defined in [26 U.S.C. § 5845(f)]."[24]

**Methodology**

Waltenbaugh and Eggleston were both questioned about the methodology and practices ATF follows when conducting a post-blast investigation. The Explosive Technology Branch members have agreement about "the process of the device determination," but no written protocols because they "do not work in a laboratory-type environment."[25] There are "general guidelines for post-blast investigations," but not specific standards that must be followed.[26] Waltenbaugh and Eggleston testified, however, that the guidelines take a comparative analysis approach where they compare "the components of the items of evidence to the technical terms that are defined within the statute."[27] The known item, under the comparative analysis model, is the definition of a destructive device.[28] "The unknown items are the components and the materials that" are recovered from a "scene and the type of energies" and other things those items tell them.[29]

The comparative analysis model loosely follows the ACE-V methodology, which stands for "analyze, compare, evaluate and either validate or verification."[30] In conducting an analysis, ATF looks at the physical evidence and corresponding reports to determine if the device was designed as

---

[24] *Id.* at 219:22–220:1; *see also id.* at 200:11–14 (stating the "device was designed to function by explosion"); *id.* at 202:2 (stating the device "was used as a weapon").

[25] Hr. Tr., 144:2–7, 189:23–190:5 (Docket No. 371).

[26] *See id.* at 143:3–11.

[27] *Id.* at 145:7–11; *see also id.* at 189:15.

[28] *Id.* at 147:16–20.

[29] *Id.* at 147:20–23.

[30] *Id.* at 148:10–12, 188:19–22.

a weapon.[31] Next, it determines whether the device was an "explosive, incendiary, or poisonous gas."[32] Third, it determines whether the device is "a bomb, grenade, mine, rocket, missile or . . . similar device," or whether the components can "be readily assembled to create such a device."[33] If it meets all three elements, then the explosive enforcement officer concludes it is a destructive device.

The officer then writes a report, which is reviewed by his or her supervisor, who is a senior explosive enforcement officer.[34] That person conducts a similar examination as the first officer.[35] If the senior officer reaches the same conclusion, the report is sent to the "branch chief who again looks at all criteria, all of the information, and either agrees or disagrees."[36] If the branch chief agrees with the determination, ATF issues a formal statement that the device is a destructive device.[37] Unless there is a concurring opinion at all three levels of review, ATF does not issue such a statement.[38] Eggleston testified that ATF has a zero error rate because if a device does not meet the statutory definition no opinion is rendered.[39]

---

[31] *Id.* at 190:9–15.

[32] *Id.* at 190:15–17.

[33] *Id.* at 190:17–21.

[34] *Id.* at 192:18–20.

[35] *Id.* at 192:21–22.

[36] *Id.* at 192:23–25.

[37] *Id.* at 193:1–2.

[38] *Id.* at 195:3–8.

[39] *Id.* at 193:16–24. The court questions this conclusion because an ATF determination can be and has been challenged by experts who have differing opinions. The very fact that experts can disagree seems to indicate that there is room for error in a determination.

ATF gives presentations and teaches about the comparative analysis guidelines both within the bureau and to other bomb squads across the country.[40] Their methodology "is also generally accepted amongst other explosive investigators, for example, organizations like the International Association of Bomb Technicians and Investigators. They have looked at [ATF's] conclusions and accepted those are correct conclusions and [ATF is] following the proper protocol in reaching [its] conclusions."[41]

## ANALYSIS

### I. RULE 702 REQUIREMENTS

#### A. Standard for Admissibility of Expert Testimony

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education" may testify about "scientific, technical, or other specialized knowledge" if it will assist a jury "to understand the evidence or to determine a fact in issue,"[42] provided the following conditions are met:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[43]

At times, clear lines do not exist "between scientific knowledge and technical or other specialized knowledge,"[44] but both types of knowledge can assist a jury in making a determination.

---

[40] *Id.* at 148:4–8.

[41] *Id.* at 191:5–11.

[42] Fed. R. Evid. 702.

[43] *United States v. Baines*, 573 F.3d 979, 985 (10th Cir. 2009) (quoting Fed. R. Evid. 702).

[44] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999) (quotation marks omitted).

Consequently, expert testimony is "not improper simply because it was not scientific."[45] Rather, "Rule 702 authorizes opinion testimony by experts" with technical or specialized knowledge that "can be acquired through experience and training."[46]

Although *Daubert* listed factors that may be considered when making a reliability determination about an expert's opinion, those factors "'are not to be applied woodenly.'"[47] This is so because not all fields are amenable to strict scientific methodology. Indeed, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[48] The Advisory Committee Notes to Rule 702 state that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."[49] Law enforcement officers fall within this realm because they "can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters" due to their experience.[50]

While the Rules of Evidence have a "liberal thrust,"[51] the court still has a gatekeeper role to ensure that all proffered expert testimony is both relevant and reliable.[52] Because the government

---

[45] *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009).

[46] *Id.* (quotation marks and citation omitted).

[47] *Id.*

[48] *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 150) (alteration omitted).

[49] Fed. R. Evid. 702, advisory committee notes (2000).

[50] *Garza*, 566 F.3d at 1199 (citations omitted).

[51] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (quotation marks and citations omitted).

[52] *Id.* at 589.

8

is the proponent for admitting Waltenbaugh and Eggleston's testimony, it bears the burden of establishing by preponderance of the evidence that their testimony is admissible.[53]

### B. Methodology Used in This Case

Zajac contends Eggleston should not "be permitted to testify due to the lack of a known rate of error, no recognized standard or protocols, no meaningful peer review, and no system for testing or establishing the proficiency of an expert in the field."[54] When determining whether a device is a destructive device, explosive enforcement officers rely, in part, on laboratory work. As discussed in a related decision in this case, many tests that identify trace evidence are scientifically based and generally accepted.[55] Eggleston relied upon these laboratory reports when making his final determination.[56] Thus, it is incorrect that all parts of the destructive device determination lacked such things as standards, protocols, and peer review.

Additionally, before a person can qualify to work for the Explosive Technology Branch, he or she has to be certified as a bomb technician. Eggleston is certified and has many years of experience working in this field. He applied this experience when analyzing the physical components found at the explosion site. In this case, such experience and training are key factors. No where in the applicable statutes is the term "bomb" defined. Thus, experience and training were critical for Eggleston to be able to identify what various remnants meant.

---

[53] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citations omitted).

[54] Def's Memo. to Exclude the Government's Explosive Enforcement Officers' Testimony, 8 (Docket No. 345).

[55] Indeed, Zajac does not challenge the determination that blue dot smokeless powder was an explosive found on the Salt Lake City bomb remnants.

[56] Hr. Tr., 197:25–198:7 (Docket No. 371).

9

Moreover, Eggleston testified that general guidelines do exist to inform an officer how to proceed with a determination, and that those guidelines are taught throughout the explosive enforcement community. Eggleston followed those guidelines when doing his comparative analysis. Furthermore, ATF renders no formal opinion until a device passes through three levels of review, which also occurred in this case. The court, therefore, concludes that the methodology employed by Eggleston was sufficiently reliable.

## II. SCOPE OF EGGLESTON'S TESTIMONY

### A. Determination that the Device Was a Weapon and a Pipe Bomb

Zajac contends that Eggleston's testimony must be excluded because his opinion exceeds the scope of his scientific, technical or specialized knowledge by involving a legal conclusion.[57] Eggleston opines that the relevant device was an "explosive weapon commonly known as a pipe bomb and would be properly identified as an explosive bomb. Explosive bombs are destructive devices as that term is defined in [26 U.S.C. § 5845(f)]."[58] To make this determination, Eggleston had to conclude the device was (1) a weapon, (2) an explosive, and (3) a bomb.[59]

Rule 704 of the Federal Rules of Evidence states, in relevant part, that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[60] "[T]estimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function by telling it how to decide the

---

[57] Def's Memo. to Exclude the Government's Explosive Enforcement Officers' Testimony, 6 (Docket No. 345).

[58] Hr. Tr., 219:23–220:1 (Docket No. 371).

[59] *See* 26 U.S.C. § 5845(f).

[60] Fed. R. Evid. 704(a).

10

case."[61] Hence, the issue is whether Eggleston's opinions embrace an ultimate issue of fact or an ultimate question of law. Opining on an issue of fact is permissible, but opining on a question of law is not.

In *United States v. Markley*, an ATF explosive enforcement officer testified that the devices at issue in the case contained "black powder, had a delay explosive firing train (fuse) and were designed and constructed as weapons."[62] He also testified "the black powder was an explosive and it's designed to be exploded."[63] Thus, "in his opinion the subject devices were explosive bombs."[64] Although the parties did not challenge the admissibility of such evidence, the Tenth Circuit has cited *Markley*, with approval, for the proposition that an expert may opine that a device is an explosive bomb because it is an ultimate question of fact rather than merely a legal conclusion.[65]

In *United States v. Homa*, the Tenth Circuit faced the question of whether a device was a destructive device.[66] It noted that a "destructive device" does "not include any device which is neither designed nor redesigned for use as a weapon."[67] Two experts were permitted to testify, without challenge, that the primary use of the device "was to inflict casualties."[68] Similarly, in

---

[61] *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).

[62] *United States v. Markley*, 567 F.2d 523, 525 (1st Cir. 1977).

[63] *Id.* (quotation marks omitted).

[64] *Id.*

[65] *United States v. Buchanan*, 78 F.2d 477, 483–84 (10th Cir. 1986), *overruled on other grounds by United States v. Welch*, 928 F.2d 915, 917–18 & n.3 (10th Cir. 1991).

[66] *United States v. Homa*, 608 F.2d 407, 409 (10th Cir. 1979).

[67] *Id.* (quotation marks omitted).

[68] *Id.*

11

*United States v. Smith*, an explosives expert was permitted to testify that the bomb in that case "was designed to maim and kill bystanders and to destroy property."[69]

These cases support that merely because an expert proposes to testify about a statutory element does not mean his or her testimony must be precluded. No issue was removed from the jury. Indeed, the defendants could have cross-examined the experts or called their own experts to rebut the opinions that were offered,[70] which squarely places a jury in a decision-making mode of weighing credibility and resolving factual questions.

Here, Zajac is charged under several statutes. As stated above, the applicable statutes do not provide a definition for a "bomb," nor can a lay person merely look at such things as a timer, alligator clip, battery, and green fibers and know that they are components of a bomb, or that, together, they act as a weapon. This is specialized knowledge that comes through experience and training. Eggleston is a certified bomb technician, with many years of experience analyzing and identifying remnants to determine what the device is and whether it was designed for use as a weapon. Moreover, he is an explosive enforcement officer with ATF, whose designated function includes involvement in criminal investigations related to firearms and explosives.[71] Determining whether components constituted (1) a weapon, (2) an explosive, and (3) a bomb falls within his special purview as an ATF officer. Consequently, Eggleston's expert opinion that the device was an explosive weapon, commonly known as a pipe bomb, does not exceed the scope of his expertise and is admissible testimony.

---

[69] *United States v. Smith*, 502 F.3d 680, 685 (7th Cir. 2007).

[70] *Id.* at 688 (citation omitted).

[71] *See* 28 U.S.C. § 599A(b) (2010).

### B. Determination of a Destructive Device

Rather than simply stating that the device was an explosive weapon, commonly known as a pipe bomb, Eggleston further opined that the device was a destructive device as defined by statute.[72] Because Eggleston does not hold a law degree, Zajac contends that he cannot interpret statutory law for purposes of opining on the definition of a destructive device.[73]

ATF is part of "the Department of Justice under the general authority of the Attorney General."[74] The Attorney General has been charged with implementing rules and regulations "to carry out the provisions of" various Congressional acts related to firearms and explosives.[75] Among these acts is the National Firearms Act ("NFA"), which requires the registration of all firearms.[76] In accordance with statutory language, ATF regulations define a "destructive device" and state that it is a firearm.[77] ATF regulations also provide a procedure whereby a person may obtain a determination from ATF about whether a device constitutes a "destructive device" for purposes of registration.[78]

Although registration is not the same as a post-blast investigation, the regulation supports that

---

[72] The court recognizes that Waltenbaugh merely made a preliminary determination, but his conclusion likewise was based on the statutory definition of a destructive device.

[73] Def's Memo. to Exclude the Government's Explosive Enforcement Officers' Testimony, 6 (Docket No. 345).

[74] 28 U.S.C. § 599A(a)(1).

[75] *See* 18 U.S.C. § 926 (2010); *see also* 26 U.S.C. § 7801(a)(2)(A) (clarifying that the administration and enforcement of certain laws is to "be performed by or under the supervision of the Attorney General").

[76] *See* 26 U.S.C. § 5841 (2010).

[77] *See* 27 C.F.R. § 479.11 (2010).

[78] *Id.* § 479.24.

an integral part of ATF's work also involves identifying destructive devices. Consequently, ATF explosive enforcement officers can acquire an expertise in determining whether an object is a destructive device without going to law school and obtaining a law degree. This does not automatically mean, however, that they may inform the jury that a device meets a statutory definition. The court must still determine whether their opinion is one of fact or law.

The case of *United States v. Langan* is instructive. The case involved an analysis of a device that was used in a bank robbery. An FBI expert in hazardous devices and explosives examination testified about how the device was engineered.[79] He opined the device was capable of exploding, and that based on his experience, the device was a pipe bomb.[80] He further "testified that the pipe bomb contained the necessary components for a destructive device."[81]

In *United States v. Buchanan*, the defendant was convicted for the "manufacture and possession of an unregistered firearm."[82] At issue was a device consisting "of a plastic milk container filled with gasoline and charcoal fluid."[83] It was sealed "with a fuse made out of rags."[84] At trial, an ATF officer testified as follows:

> Q. The type of device that they have described here in the courtroom, would that type of device have to be registered with . . . the Bureau of Alcohol, Tobacco and Firearms?

---

[79] *United States v. Langan*, 263 F.3d 613, 617 (6th Cir. 2001).

[80] *Id.*

[81] *Id.*

[82] *Buchanan*, 78 F.2d at 479.

[83] *Id.*

[84] *Id.*

A. Yes.[85]

The defendant contended that the testimony constituted a legal conclusion and was therefore impermissible. The Tenth Circuit disagreed because "[w]hether the nature of a particular device is such that it must be registered is an ultimate fact question."[86] Because the opinion addressed an ultimate issue of fact rather than "unadorned legal conclusions," the testimony was admissible.[87]

Here, Eggleston's opinion is not an unadorned legal conclusion. He examined the physical components of the device and evaluated them in conjunction with laboratory reports. In stating his opinion that the device was a destructive device, he does so in the context of the totality of his factual findings. The court therefore concludes that Eggleston may testify that in his opinion the device was a destructive device. Eggleston may not testify, however, that "[e]xplosive bombs are destructive devices as that term is defined in [26 U.S.C. § 5845(f)]." The latter testimony is inadmissible because it constitutes an instruction to the jury that an explosive bomb meets the legal definition of a destructive device. With respect to Count III of the Second Superseding Indictment, the court further concludes, based on *Buchanan*, that Eggleston may testify the device at issue is the type of device that had to be registered with ATF.

The court cautions that a fine line exists between what testimony it is admitting and what it is not. The line pertains not only to the ultimate opinion of the expert, but also to how the

---

[85] *Id.* at 483.

[86] *Id.* (citations omitted).

[87] *Id.* at 483–84. In *United States v. McCauley*, the Eighth Circuit similarly allowed the government's expert to testify that a weapon constituted a machine gun and that it was required to be registered under the National Firearms Act. 601 F.2d 336, 339 (8th Cir. 1979).

government states its questions.[88]

### III. SCOPE OF WALTENBAUGH'S TESTIMONY

Waltenbaugh's testimony stands on a different footing than Eggleston because Waltenbaugh was involved only in the initial stages of the investigation and he merely rendered a preliminary opinion that the device was a destructive device. A preliminary opinion is not recognized by ATF because it is not based on "all of the other forensic or analytical work [that] has been completed."[89] Accordingly, Waltenbaugh may not testify that the device was a destructive device because his opinion was not based on all of the evidence.

Although Waltenbaugh cannot render this ultimate conclusion, his opinion about what he observed may nevertheless be helpful to the jury. Rule 702 allows "the venerable practice of using expert testimony to educate the factfinder on general principles."[90] As stated above, Waltenbaugh has many years of experience as an explosive enforcement officer and bomb technician. His observations about the bomb remnants and how the device was constructed may help educate the jury about pipe bombs, in general, and the role that certain components play. Accordingly, Waltenbaugh may testify on this limited basis, but he cannot opine that the pipe bomb constituted a destructive device.

### IV. TESTIMONY ABOUT THE BOMB COMPONENTS

In his reply memorandum, Zajac contends the government should be precluded from calling

---

[88] *See United States v. Two Eagle*, 318 F.3d 785, 793 (8th Cir. 2003) (citation omitted) (stating the government should not have asked questions using the specific statutory language).

[89] Hr. Tr., 142:13–16 (Docket No. 371).

[90] *United States v. Nacchio*, 555 F.3d 1234, 1275 (10th Cir. 2009) (citing Fed. R. Evid 702 advisory committee note) (quotation marks omitted).

experts to opine about the mechanics of the device, how it was assembled, or how it "operably fit together," because the government failed to provide notice of its intention to offer such evidence.[91] In Zajac's Motion to Exclude Testimony of Forensic Explosives Expert and Request for Daubert Hearing, Zajac provided no information as to why he moved to exclude the testimony.[92] As a result, the government requested that Zajac "provide a more detailed reasoning in support of his challenges."[93] Zajac presented no evidence to the court to show he complied with this request and put the government on notice about what expert testimony he was challenging.

Moreover, during the *Daubert* hearing, Waltenbaugh testified that he drew a schematic about how the device was constructed. Eggleston opined the device was an explosive weapon consistent with a pipe bomb. To make these drawings and determinations, one must necessarily conclude how the device functioned. Their testimony put Zajac on notice that these experts were not merely identifying components, but also opining about how they worked and fit together. Zajac had a full opportunity to examine these experts about their testimony. Consequently, Zajac's motion to preclude such testimony is denied.

## V.     RULE 403

Finally, Zajac contends that Waltenbaugh and Eggleston's testimony must be precluded due to unfair prejudice because they are rendering legal conclusions. Zajac also contends their testimony may confuse the jury about the applicable law and cause serious risk that the jury will give undue

---

[91] Def's Reply Memo. to Exclude the Government's Explosive Enforcement Officers' Testimony, 3 (Docket No. 367).

[92] *See* Docket Nos. 102 and 131.

[93] Motion to Continue Daubert Hearing & Request for Particularity Regarding Defendant's Exclusion of Expert Testimony, 5 (Docket No. 295).

deference to the experts' opinions. Rule 403 states, in relevant part, that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[94] "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."[95] Only if there is substantial disparity between the prejudice and the probative value should evidence be excluded.[96]

Here, Waltenbaugh and Eggleston's opinions have significant probative value. The court, nevertheless, has limited the scope of their testimony to preclude Waltenbaugh from testifying about mere preliminary determinations and Eggleston from opining about a legal definition. Thus, neither expert is rendering a legal conclusion. The opinions they are permitted to render may aid the jury in understanding the components of a pipe bomb and the nature of the device at issue in this case. This carries little risk that the jury will be lured into declaring guilt on improper grounds, especially since neither expert is rendering an opinion that Zajac constructed the device at issue or that he was in possession of it.[97] Those conclusions are left for the jury to decide. Moreover, because these experts are not opining about the law, there should be no inconsistency between their opinions and the jury instructions. The court therefore concludes Waltenbaugh and Eggleston's opinions do not create a risk of unfair prejudice.

---

[94] Fed. R. Evid. 403.

[95] *United States v. Nichols*, 169 F.3d 1255, 1266 (10th Cir. 1999) (quotation marks and citation omitted).

[96] *United States v. Ward*, 182 Fed. Appx. 779, 790 (10th Cir. 2006) (citations omitted).

[97] *See Nichols*, 169 F.3d at 1266.

18

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part Zajac's motion to exclude the testimony of the explosive enforcement officers.[98]

DATED this 9th day of September, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[98] Docket Nos. 102 and 131.